# In the United States Court of Federal Claims

No. 22-308
(Filed Under Seal: March 14, 2023)
(Reissued for Publication: April 6, 2023)[1]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| TONI AND VIN HOOVER PROPERTY MANAGEMENT, LLC dba HOOVER PROPERTIES, | \* \* \* |
| Plaintiff, | \* \* |
| v. | \* \* |
| THE UNITED STATES, | \* \* |
| Defendant, | \* \* |
| and | \* \* |
| MSDG FRANKFORT, LLC, | \* \* |
| Defendant-Intervenor. | \* \* \* |

Post-Award Bid Protest; Motion for Judgment on the Administrative Record; Unequal Treatment; Inadequate Documentation; Unstated Evaluation Criteria; FAR 19.602-1(a); Prejudice; Injunctive Relief.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Diana Parks*, Curran Legal Services Group, Inc., Marietta, GA, Counsel for Plaintiff. With whom was *Hadeel N. Masseoud*, of counsel.

*Stephen J. Smith*, U.S. Department of Justice, Civil Division, Washington, DC, Counsel for Defendant. With whom was *Carisa LeClair*, Assistant Regional Counsel, General Services Administration, of counsel.

*Gordon Griffin*, Holland & Knight LLP, Washington, DC, Counsel for Defendant-Intervenor. With whom were *Robert C. MacKichan, Jr.*, *Hillary J. Freund*, and *Sean Belanger*, of counsel.

## OPINION AND ORDER

**Dietz, Judge.**

---

[1] This Opinion and Order was filed under seal on March 14, 2023, *see* [ECF 48], in accordance with the Protective Order entered on March 25, 2023, *see* [ECF 13]. The parties were given an opportunity to identify protected information, including source selection information, proprietary information, and confidential information, for redaction. The parties filed a joint status report on March 28, 2023, with agreed upon proposed redactions. [ECF 50]. The Court accepts the parties' proposed redactions. All redactions are indicated by bracket asterisks, e.g., "[* * *]."

Toni and Vin Hoover Property Management, LLC ("Hoover") protests a decision by the United States General Services Administration ("GSA") to award MSDG Frankfort, LLC ("MSDG") with a ten-year lease of commercial office space for use by the Social Security Administration ("SSA"). Hoover challenges the GSA's evaluation of the lease offers and source selection decision as arbitrary, capricious, lacking a rational basis, an abuse of discretion, and otherwise not in accordance with the law. Because the Court finds that the GSA failed to adequately document its evaluation and source selection decision and that Hoover was prejudiced by this failure, Hoover's motion for judgment on the administrative record is **GRANTED**, and the government's and MSDG's respective cross-motions for judgment on the administrative record are **DENIED.**

## I.   BACKGROUND

### A.  The GSA Automated Advanced Acquisition Program

The GSA conducted this procurement using the Automated Advanced Acquisition Program ("AAAP"). AR 117, 1726. The AAAP is a procurement process and automated online application that allows building owners to offer general purpose office space for lease by the federal government. AR 4.[2] The AAAP is described in detail in Chapter 22 of the GSA Public Buildings Service Leasing Desk Guide ("LDG"). *See* AR 1-56. The LDG contains policies, in addition to technical and procedural guidance, governing the federal government's acquisition by lease of real property. *See generally id.*

The AAAP is unlike a traditional procurement. *See* AR 6-7 (comparing the AAAP and the traditional process). It is designed to reduce lease cycle time, streamline procurement planning, obtain competitive pricing, and promote efficient interaction with the GSA. AR 7. Building owners input their proposals into the AAAP system in connection with a generic Request for Lease Proposals ("RLP") package, which outlines space requirements and applies to a specific geographic region. AR 5. This allows building owners to submit one offer for all potential future AAAP procurements within a given region. *Id.* Once an agency requirement is identified, the GSA places a project-specific advertisement identifying the agency's unique requirements and invites offerors to submit new offers or amend existing offers. AR 5, 17, 22. The AAAP then matches the requirement against the submitted offers. AR 4, 7. The offers that meet the agency's requirements, such as square footage, lease term, and number of parking spaces, etc., are then ranked by net present value ("NPV") to identify the lowest priced technically acceptable ("LPTA") offer. AR 4, 24.

When making an offer through the AAAP, offerors are prompted to complete a series of online questions and input information about the building, parking, and owner. AR 20. The AAAP also collects various financial components and auto-calculates fields based on inputted information. *Id.* In doing so, "the AAAP eliminates math and other errors that are commonly present in offers received through the traditional paper submission process." AR 8. Further, although the AAAP allows offerors to view their respective offers before submission, it does not permit negotiations and considers submitted offers to be final proposals. AR 8, 17.

---

[2] The Court cites to the Administrative Record filed by the government at [ECFs 19, 21-2, 21-3] as "AR ___."

The AAAP allows the government user to modify certain costs that are used in evaluating an offer's NPV, such as the Tenant Improvement Allowance ("TIA"). *See e.g.,* AR 23-25. Pertinent to Hoover's protest, the AAAP allows the government to modify the TIA for incumbent leases "for those circumstances where minimal [tenant improvement] work (e.g., paint, carpet, vinyl wall base, etc.) is required at the Government's existing location." AR 23. Additionally, it allows the government to consider adding move-related costs for nonincumbent offerors. AR 24. Once these costs have been assessed and finalized for each offeror, the AAAP will calculate each offer's NPV to identify the LPTA offer. AR 24-25. If the identified LPTA offer passes due diligence review, the GSA will select this offer for award. AR 29.

### B. The Solicitation, Proposals, and Evaluation

In October 2019, the GSA issued an advertisement to lease 11,807[3] ABOA[4] Square Feet ("SF") of office space in Frankfurt, Kentucky, for the SSA. AR 116-18, 1726. The advertisement was "incorporated into the [applicable RLP package] by way of reference[.]" AR 116. The advertisement stated that the "[l]ease award will be made to the [LPTA] offer, without negotiations, based upon the requirements in [the] advertisement and in the RLP requirements package." AR 117. The RLP contained instructions for "how to offer," directing offerors to "prepare a complete offer, using the online workflow." AR 175. It required offerors to upload certain attachments into the AAAP; however, it warned that "Riders, Clarifications to Offer, Exceptions to Offer and other additions, deletions, or changes to the terms of the RLP will not be accepted by the Government." AR 176. It stated that the evaluation of the proposed prices was "based on the annual price per ABOA SF" and that the GSA would conduct a present value price evaluation to determine the LPTA offer. AR 181-82. It further provided that the TIA for the existing leased space and newly leased space would be specified in the advertisement. AR 179.

The initial advertisement established that the TIA for the existing leased space was $34.27 per ABOA SF and the TIA for newly leased space was $34.37 per ABOA SF. AR 117. Hoover submitted an offer on November 7, 2019, AR 125-128, and its offer was identified as the LPTA offer. AR 801. The AAAP calculated an NPV of [* * *] per ABOA SF for Hoover and [* * *] per ABOA SF for MSDG, the incumbent offeror. *See id.* However, the GSA declined to award the lease to Hoover because it was determined to be mission critical for the SSA to stay in place until the end of their lease term due to funding concerns. *Id.* The SSA lease requirement was re-advertised on December 18, 2019, with the same TIA amounts as the initial advertisement. AR 135, 137. Hoover was again identified as the LPTA, and the GSA began gathering due diligence documents to confirm that Hoover's building met the SSA's requirements. AR 803. However, the GSA again declined to award the lease to Hoover, explaining that the RLP must be re-advertised due to new agency parking requirements. AR 816.

---

[3] The initial advertisement on October 1, 2019, stated the square footage required was 1,160 ABOA. AR 104, 109. This was changed by a new advertisement issued on October 17, 2019, which stated that the required square footage was 11,807 ABOA. AR 116.

[4] The acronym "ABOA" stands for "American National Standards Institute/Building Owners and Managers Association Office Area." AR 162. An "ANSI/BOMA Office Area" is the area "where a tenant normally houses personnel and/or furniture." *See* 48 C.F.R. § 552.270-4(a).

The SSA lease requirement was re-advertised in March 2020. *See* AR 193-97. The updated advertisement provided a reduced TIA for the existing leased space of $5.85 per ABOA SF and an increased TIA for newly leased space of $41.13 per ABOA SF. AR 195. Hoover submitted an offer in response to this advertisement in April 2020. AR 639. As part of its offer, Hoover submitted a letter offering to pay for "ALL physical costs associated with relocation from [the] current space to [the new space], including moving of all furniture, fixtures, telephones, computers and electronics." AR 832. On April 23, 2020, the GSA notified Hoover that its offer was not selected. AR 664. The notice stated that Hoover's NPV was calculated at [* * *] per ABOA SF and that the awarded offer submitted by MSDG was calculated at [* * *] per ABOA SF. *Id*. The GSA did not consider Hoover's offer to cover moving costs as part of its NPV evaluation. *See* AR 657.

### C.  The Subsequent Protests and Final Award

On April 30, 2020, Hoover filed an agency-level protest challenging the GSA's evaluation of Hoover's NPV. AR 671. Hoover argued that the GSA added relocation and other costs to the NPV calculation that were not disclosed and requested that the GSA provide a mathematical explanation. AR 727-31, 848. The GSA protest official determined that the GSA had properly evaluated Hoover's NPV and denied the protest on June 10, 2020. AR 851.

Hoover then filed a protest with the United States Government Accountability Office ("GAO") on June 19, 2020, arguing that the GSA's evaluation of Hoover's offered price was flawed and unreasonable. AR 853, 863. Hoover argued that the solicitation contained "no indication . . . that additional move-related or other costs would be factored in by [the] GSA" and that the GSA conducted an unreasonable price evaluation when it added such undisclosed flat costs to the NPV price evaluation. AR 863-64. Despite Hoover's arguments to the contrary, the GAO concluded that the RLP "clearly put offerors on notice that relocation and move-related costs were to be added during the agency's NPV price evaluation." AR 1322. However, the GAO sustained the protest on the grounds that "the record is devoid of documentation sufficient . . . to conclude that the relocation and move-related costs added to Hoover's NPV price were reasonable." AR 1325. The GAO recommended that the GSA "conduct and adequately document a new NPV price evaluation . . . and make a new source selection decision based on that reevaluation." AR 1326.

On June 10, 2021, the GSA notified Hoover that it intended to cancel the advertisement and to resolicit it with new requirements. AR 1329. Hoover filed a second GAO protest, this time challenging the GSA's cancellation decision. AR 1335. This protest was dismissed after the GSA notified the GAO that it would reinstate the original solicitation and make a new award decision based on the original solicitation and existing offers. AR 1347.

The GSA undertook a new NPV price evaluation in July 2021. AR 1926. The initial NPV evaluation was based on the following estimated relocation costs: [* * *] per ABOA SF for furniture and personal property; [* * *] per ABOA SF for telecommunications equipment; and [* * *] per ABOA SF for tenant improvements in a new location. AR 657. However, the lease contracting officer ("LCO") "was unable to substantiate the Move and Replication Costs used at the outset of the procurement, so [she] requested additional information from the tenant-agency

and requested that an Independent Government Estimate (IGE) be performed for each component of the Move and Replication Costs." *Id.*; *see also* AR 1349-52. Based on the newly obtained independent government estimates, the estimated relocation costs were revised as follows: [* * *] per ABOA SF for furniture relocation; [* * *] per ABOA SF for telecommunications equipment relocation; and [* * *] per ABOA SF for tenant-improvement in a new location. AR 1354. Based on the revised costs, the NPV of Hoover's offer was calculated to be [* * *] per ABOA SF, which exceeded MSDG's NPV of [* * *] per ABOA SF. AR 1354-55.

Having identified MSDG's offer as the LPTA offer, the GSA requested and received due diligence information from MSDG. AR 1358-61. On November 9, 2021, the GSA determined that MSDG was ineligible to receive the award because it failed to "demonstrate proof of current good standing[,]" and the GSA subsequently notified MSDG of its determination. AR 1442. The GSA then referred the responsibility issue to the Small Business Administration ("SBA") to request a Certificate of Competency ("COC") for MSDG. AR 1628.[5] After receiving a COC for MSDG from the SBA, AR 1720, the GSA determined that the award should be made to MSDG. AR 1927. The GSA notified Hoover on February 3, 2022, that it intended to award the lease to MSDG. AR 1734. Hoover proceeded to file its fourth protest with the GAO, which Hoover subsequently voluntarily dismissed in order to file its claim in this Court. AR 2114; Pl.'s Am. Mot. for J. on the Admin. R. [ECF 23-1] at 10.[6]

Hoover filed its complaint in this Court on March 21, 2022. Compl. [ECF 1]. Hoover subsequently filed an amended motion for judgment on the administrative record ("MJAR").[7] [ECF 23-1]. The government and MSDG each filed oppositions to Hoover's MJAR and cross-motions for judgment on the administrative record. Def.'s Cross-Mot. for J. on the Admin. R. [ECF 25]; Def. Intervenor's Cross-Mot. for J. on the Admin. R. [ECF 26]. The motions are fully briefed, and the Court held oral argument on July 15, 2022. *See* Scheduling Order [ECF 33]. During oral argument, Hoover advanced an argument that the government and MSDG contend Hoover waived because it failed to raise the argument in its briefing. As instructed by the Court, the parties filed supplemental briefing on this issue, which was fully briefed as of August 16, 2022. *See* Pl.'s Supp. Br. [ECF 39]; Def. Intervenor's Supp. Br. [ECF 40]; Def.'s Supp. Br. [ECF 41]; Pl.'s Resp. to Supp. Br. [ECF 42].

## II.   LEGAL STANDARDS

The Tucker Act grants this Court "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or

---

[5] While the GSA was waiting on a COC from the SBA, Hoover filed a third protest on November 22, 2021, arguing that the GSA had failed to take corrective action because the GSA had not made a new award. AR 1447. This protest was dismissed as premature. AR 1626.

[6] All page numbers in the parties' briefings refer to the page number generated by the CM/ECF system.

[7] After Hoover filed its initial MJAR, the government moved to correct the administrative record with documents it inadvertently omitted. *See* Def.'s Mot. to Correct Admin. R. [ECF 21]. As a result of the government's corrected administrative record, the Court allowed Hoover to amend its MJAR. *See* Order [ECF 24].

regulation in connection with a procurement[.]" 28 U.S.C. § 1491(b)(1) (2018). The Tucker Act's waiver of sovereign immunity "covers a broad range of potential disputes arising during the course of the procurement process[,]" including "objections to an award[.]" *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1380 (Fed. Cir. 2012).[8]

      Under Rule 52.1 of the Rules of the United States Court of Federal Claims, a party may file a motion for judgment on the administrative record to assess whether a federal administrative body acted in accordance with the legal standards governing the decision under review. *Agile Def., Inc. v. United States*, 143 Fed. Cl. 10, 17 (2019). This motion "is often an appropriate vehicle to scrutinize an agency's procurement actions because such cases typically involve interpretation of contract documents or regulations, thereby presenting no disputed issues of material fact." *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1352 (Fed. Cir. 2004). On a motion for judgment on the administrative record, the parties are limited to the administrative record, and the court makes factual findings as if it were conducting a trial on the record. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1357 (Fed. Cir. 2005). The court's inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A&D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006).

      The court reviews agency decisions in bid protests using the standard of review set forth in the Administrative Procedure Act ("APA"). 28 U.S.C. § 1491(b)(4); *Impresa Construzioni Geom. Deomenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). This standard permits the court to set aside an agency's contracting decision if the protestor shows it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Bannum*, 404 F.3d at 1351. "Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency[] but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts." *Glenn Def. Marine (Asia), PTE Ltd. v. United States*, 105 Fed. Cl. 541, 559 (2012) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The protestor has the burden to show by a preponderance of evidence the arbitrary and capricious nature of the agency's decision. *Mortg. Contracting Servs., LLC v. United States*, 153 Fed. Cl. 89, 124 (2021).

      While the APA standard calls for considerable deference to the agency, *Advanced Data Concepts, Inc. v. United State*s, 216 F.3d 1054, 1058 (Fed. Cir. 2000), the court may set aside an agency's procurement decision if the decision lacked a rational basis, or the procurement procedure involved a violation of regulation or procedure. *Impresa*, 238 F.3d at 1332; *see also Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1343 (Fed. Cir. 2021). Nevertheless, if the reviewing court finds that the agency's action evinced rational reasoning and consideration of relevant factors, it must sustain the agency's action. *Advanced Data Concepts*,

---

[8] The parties to this litigation do not challenge the Court's jurisdiction over Hoover's complaint or Hoover's standing as an interested party. However, the Court "has an obligation to satisfy itself that jurisdiction is proper[.]" *L-3 Commc'ns. Corp. v. United States*, 99 Fed. Cl. 283, 288 (2011) (citing *Hertz Corp. v. Friend*, 559 U.S. 77, 130 (2010)). Based on Hoover's complaint and the administrative record filed by the government in this case, the Court is satisfied that it has jurisdiction to render judgment on Hoover's challenge to the GSA's evaluation and source selection decision and that Hoover has standing to bring its challenge.

*Inc.,* 216 F.3d at 1058 (citing *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974)).

## III.   DISCUSSION

Hoover argues that the GSA acted arbitrarily and treated Hoover and MSDG unequally by failing to adequately document its NPV evaluation. Hoover also argues that the GSA utilized undisclosed criteria when calculating Hoover's NPV, arbitrarily ignored Hoover's offer to pay for move-related costs, and improperly assisted MSDG in restoring its eligibility for award. For the reasons set forth below, the Court finds that the GSA failed to adequately document its NPV evaluation and that Hoover was prejudiced by this failure. The Court otherwise finds that the GSA did not utilize unstated evaluation criteria, did not act unreasonably when it ignored Hoover's offer to pay move-related costs, and did not violate the RLP terms or procurement regulations by referring MSDG's competency matter to the SBA.[9]

### A.    The GSA Failed to Adequately Document Its NPV Evaluation.

Hoover argues that the GSA engaged in unequal treatment in conducting its NPV evaluation and that its NPV evaluation "falls significantly short of the documentation requirements for source selection decisions." [ECF 23-1] at 21. Specifically, it argues that the GAO's decision following Hoover's first protest required that the GSA conduct a new NPV calculation for Hoover *and* MSDG, and that it failed to take corrective action by conducting a new NPV calculation for Hoover only. [ECF 23-1] at 19-20. Further, Hoover argues that MSDG's "AAAP NPV output results provide nowhere near the level of detail or explanation behind Hoover's NPV evaluation . . . " and, without adequate documentation, "there is no way to assess whether [the] GSA has a reasonable basis for its award decision." [ECF 23-1] at 20-21. The Court finds that, while the GSA had a rational basis for treating Hoover and MSDG differently when conducting the NPV evaluation, it failed to adequately document the TIA values assigned to MSDG and Hoover.

---

[9] Hoover, throughout its briefing, insinuates that bad faith or improper motive affected the GSA's evaluation process and that the GSA was not interested in conducting a fair competition and was instead driven by the tenant agency's desire to remain in its existing leased space. *See* [ECF 23-1] at 14 (alleging that "the undisclosed 'replication costs' were added to Hoover's NPV as a smokescreen so that the Agency could reverse engineer an outcome"); *id*. at 15 (alleging that the additional costs added to Hoover's NPV "permit the Government to create a false impression of competition when in fact the Agency never intended to fairly evaluate offers"); *id*. at 26 (alleging that the GSA's actions with respect to MSDG's eligibility "occurred so that SSA could remain in the incumbent lessor's space"). To succeed on a claim of bad faith by the government, a protestor must provide clear and convincing evidence of bad faith to overcome the general presumption that the government acts in good faith in conducting its procurement activities. See *Galen Med. Assocs. v. United States,* 369 F.3d 1324, 1330 (Fed. Cir. 2004). The necessary evidence has been equated with evidence of some specific intent to injure the protestor. *Id*. (quoting *Torncello v. United States*, 231 Ct. Cl. 20, 681 F.2d 756, 770 (1982)). In this instance, despite hinting that the GSA acted in bad faith, Hoover has explicitly stated that it is not alleging bad faith by the GSA. *See* July 15, 2022, Oral Arg. at 50:25-51:10. Further, Hoover has failed to provide evidence of bad faith sufficient to meet its evidentiary burden. *See BayFirst Sols., LLC v. United States*, 104 Fed. Cl. 493, 506-07 (2012) (stating that "bid protest plaintiffs attempting to avoid the evidentiary burden required to show bad faith should not be permitted to disguise such allegations so as to avoid the relevant burden of proof").

A claim of unequal treatment is derived from the Federal Acquisition Regulation ("FAR") requirement that "[a]ll contractors and prospective contractors shall be treated fairly and impartially but need not be treated the same." FAR 1.102-2(c)(3). "Instead, an agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently." *Agile-Bot II, LLC v. United States*, 156 Fed. Cl. 180, 230-31 (2021) (quoting *Redland Genstar, Inc. v. United States*, 39 Fed. Cl. 220, 234 (1997)) (quotation marks omitted). Furthermore, "[a]n agency must articulate a satisfactory explanation for an action to permit effective judicial review." *Lab. Corp. of Am. Holdings v. United States,* 116 Fed. Cl. 643, 652 (2014).

Hoover initially brought an agency-level protest in April 2020, "on the grounds that the agency's NPV evaluation of Hoover's proposal was unreasonable and lacked sufficient documentation." [ECF 23-1] at 8. After the agency denied this protest, Hoover filed a protest with the GAO, which sustained the protest after determining that the record was inadequate to conclude that the GSA's evaluation of Hoover's NPV was reasonable because it lacked documentation to support the estimated relocation and move-related costs added to Hoover's NPV price. AR 1324-25. The GAO recommended that the GSA conduct a new NPV price evaluation consistent with this determination and make a new source selection decision based on the reevaluation. AR 1326. The GSA subsequently substantiated the relocation and move-related costs added to Hoover's NPV evaluation with an independent government estimate for each.[10] *See* AR 1349-53. The GSA then conducted a new NPV evaluation for Hoover based on the revised costs and the previously disclosed TIA value of $41.13. AR 1354.

The Court finds that the GSA's consideration of relocation and move-related costs as part of Hoover's NPV evaluation was appropriate, given Hoover's status as a non-incumbent offeror. The LDG provides:

> If the requirement is a continuing need and an existing lessor has submitted an offer, the AAAP application *allows the Government to consider move and replication*[11] *cost as part of the present value analysis*, when applicable. If included in the evaluation, these costs

---

[10] To the extent Hoover challenges the validity of the independent government estimates, its arguments are insufficient to rebut the presumption of regularity to which the government is entitled. *See Quality Control Int'l, LLC v. United States*, 148 Fed. Cl. 425, 435 (2020) (quoting *Impresa*, 238 F.3d at 1338) (stating that the government is not required to provide an explanation for its independent government estimate unless the "presumption has been rebutted by record evidence suggesting that the agency decision is arbitrary and capricious."). If the contractor has failed to show that the independent government estimate was arbitrary and capricious, the court must presume the agency's estimate, and actions taken thereunder, were rational. *See First Enter., v. United States*, 61 Fed. Cl. 109, 120 (2004); *see also Overstreet Elec. Co., Inc., v. United States*, 47 Fed. Cl. 728, 733 (2000). A rational independent government estimate does not need to be calculated with "impeccable rigor," but must not be "tainted by irrational assumptions or critical miscalculations." *Id*. (quoting *OVM Med., Inc. v. United States*, 291 F.3d 1337 (Fed. Cir. 2000)). A simple allegation or conclusory statement challenging the validity of an independent government estimate, without supporting evidence, is insufficient. *First Enter.*, 61 Fed. Cl. at 120.

[11] Replication costs are a specific type of move-related cost described as the "Lump Sum Cost to Replicate Tenant Improvements in New Space." AR 1353. The GAO's use of the phrase "relocation and move-related costs" encompasses these replication costs. *See e.g.,* AR 1319, 1322.

must be established before running the requirement through the application, in order to maintain the integrity of the procurement, and *the source for these costs must be documented in the lease file*.

AR 24 (emphasis added). Here, the SSA had a continuing need for office space in Frankfurt, Kentucky, and MSDG, the existing lessor, submitted an offer in response to the advertisement. AR 199. The GSA complied with this provision when it considered relocation and move-related costs as part of Hoover's NPV evaluation and subsequently substantiated these costs with independent government estimates in response to the GAO's recommended corrective action. Thus, the GSA had a rational basis to add relocation and move-related costs to Hoover's NPV evaluation as the non-incumbent. *See Agile-Bot II*, 156 Fed. Cl. at 230-31. Further, because MSDG was the incumbent lessor, the GSA was not required to obtain this documentation to support MSDG's NPV calculation. *See id*.

While the GSA properly applied relocation and move-related costs to Hoover's NPV evaluation, it nevertheless neglected to evince rational reasoning and consider relevant factors by failing to substantiate the TIA values assigned to MSDG and Hoover. *See Advanced Data Concepts, Inc.,* 216 F.3d at 1058. The LDG provides that "Section 3 of the AAAP RLP states a range for the required TI Allowance to accommodate the varying allowances to which the agencies whose requirements being procured through this program are entitled." AR 23. The RLP in this case does not state a range but rather provides "an estimated placeholder TI Allowance of $35.00 per ABOA SF." AR 179. It also states that, "for price evaluation purposes, the Government will use the TI Allowance(s) as stated in the . . . project specific advertisement." *Id*. In a statement of fact and position dated August 3, 2020, the LCO explained that "[t]he March Advertisement adjusted the TIA to $5.85 per ABOA SF for the existing leased space and $41.13 per ABOA SF for new leased space, *to account for the fact that the incumbent landlord already has the required telecommunication equipment and services and would not require move-related services or furniture*." AR 1090 (emphasis added). While this statement may explain why the TIA value that the GSA applied to MSDG as the incumbent is less than the TIA value applied to Hoover as the non-incumbent, it does not substantiate with adequate documentation the TIA values that the GSA used for MSDG and Hoover.

The LDG allows the GSA to establish a modified TIA for incumbent lessors for such "circumstances where minimal TI work (e.g., paint, carpet, vinyl wall base, etc.) is required[,]" but it "*requires that the use of any figure less than the agency's full TI Allowance . . . be based on supportable evidence (e.g., an IGE)*[.]" AR 23-24 (emphasis added). Such evidence may include, for example, a confirmation by the agency that the "current location only requires repainting and carpet replacement" or that the modified estimate is based on an independent government estimate. AR 24. The LDG provides the following table as an example of the documentation of costs where a lower tenant improvement value is used for the incumbent:

*Figure 22-5*
*Example of Documentation of Costs Used for AAAP PVA, Using a Lower TI for Incumbent*

|  | Existing Lessor | New Lessor |
|---|---|---|
| **Tenant Improvement Allowance** | $16.00/ABOA SF[1] | $45.00/ABOA SF[2] |
| **Move Costs - Furniture** | Not included in NPV | $4.10/ABOA SF[3] |
| **Move costs - Telecommunications** | Not included in NPV | $3.83/ABOA SF[4] |
| **Replication Costs** | Not included in NPV | $12.00/ABOA SF[5] |

[1] XYZ agency confirmed that current location only requires repainting and carpet replacement; Figure based on IGE performed XX/XX/XX (see lease file).
[2] Reflects full TIA for XYZ Agency, per OA Tool.
[3] Furniture move costs based on Level 1 budgetary estimates for TMP option 3 (Source: Google sheet ABC).
[4] Telecommunications move costs based on Level 1 budgetary estimates for TMP option 3 (Source: Google sheet ABC).
[5] Replication costs calculated as follows: Anticipated build-out costs at new location ($57.00/ABOA SF) minus XYZ Agency's TIA ($45.00) equals $12.00. Anticipated build-out costs derived from IGE of XYZ's POR dated XX/XX/XX (see lease file) and is in line with recent XYZ projects completed since [date].

*Id.* The LDG further suggests, via a sample award determination memorandum, that the GSA should indicate whether the full TIA value was applied to non-incumbent offerors for the NPV evaluation. *See* AR 47.

Here, the record does not clearly indicate that the full TIA value for the SSA, as the tenant agency, was applied to non-incumbent offerors for NPV evaluation purposes. Footnote 2 of the above table suggests that the value applied to non-incumbent offerors reflects the full TIA value for the tenant agency. *See* AR 24. If this interpretation is applied to this case, it logically follows that the $41.13 TIA value applied to Hoover is the full TIA value for the SSA. However, the LCO's award determination memorandum does not confirm that this value constitutes the full TIA, nor does it explain why the TIA was modified from the estimated placeholder value of $35.00 in the RLP to the TIA value of $41.13 for non-incumbent offerors as shown in the advertisement. *See* AR 1726-1733. Assuming that the full TIA value for the SSA is $41.13, the GSA does not have a rational basis for utilizing the modified TIA value of $5.85 when conducting the NPV evaluation for MSDG because it did not provide supportable evidence for this reduced TIA value as required by the LDG.[12]

The lack of documentation supporting the TIA values also brings into question whether the move-related costs applied to Hoover's NPV evaluation were duplicative. The RLP suggests that the TIA does not account for move-related costs. *See* AR 179. However, the LCO's statement that the TIA values were adjusted "to account for the fact that the incumbent landlord already has the required telecommunication equipment and services and would not require move-related services or furniture[,]" AR 1090, suggests that the adjusted TIA value of $41.13 applied to Hoover did account for move-related costs, such that additional move-related costs for telecommunications and furniture should not have separately applied. In sum, because the administrative record does not clearly indicate the SSA's full TIA amount, provide supportable

---

[12] At oral argument, the government conceded that the record is unclear as to how the TIA values were derived, offering only that these values are provided from a central repository, based upon location and size of the agency, and not calculated by a real-world estimate. *See* July 15, 2022, Oral Arg. at 1:04:25-1:08:15.

evidence for the modified TIA value applied to MSDG, or address potential duplication of move-related costs, the Court finds that the GSA has failed to provide a rational basis for its award decision. *See Lab. Corp. Holdings v. United States*, 116 Fed. Cl. 643, 652 (2014) (holding that "[a]n agency must articulate a satisfactory explanation for an action to permit effective judicial review.").[13]

Having found that the GSA acted without a rational basis, the Court now considers whether Hoover was prejudiced by the GSA's error. *See Bannum*, 404 F.3d at 1351 (stating that once a court finds that an agency acted arbitrarily, the court "proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct"). For Hoover to prevail, it "must show prejudicial error." *Glenn Def. Marine (Asia), PTE, Ltd. v. United States*, 720 F.3d 901, 908 (Fed. Cir. 2013). There is no presumption of prejudice upon a showing that an agency acted irrationally. *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 998 (Fed. Cir. 2021). To establish prejudice, Hoover must show "that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003).

The Court finds that Hoover has demonstrated prejudice. Hoover and MSDG were the only two offerors. *See* AR 657. The LCO's award determination document shows that Hoover's offer would not have been selected as the LPTA offer even if the original replication and move-related costs were applied to Hoover's NPV evaluation. *See* AR 657. However, nothing in the record suggests that Hoover's offer would not have been selected as the LPTA offer were the GSA to substantiate the TIA values applied to MSDG and Hoover and determine them to be closer in value. Additionally, Hoover's proposed shell rent was less than MSDG's, and Hoover's offer had previously been identified as the LPTA offer on two separate occasions when the TIA values were nearly identical. *See* AR 801-08. Thus, it is reasonable to conclude that Hoover would have a substantial chance of receiving the award if the GSA determined that the space offered by MSDG required improvements, such as remodeling, repainting, and carpet replacement, and therefore applied an increased TIA value for MSDG. *See* AR 23-24. Further, Hoover's chance at receiving the award would increase if the GSA were to determine that the TIA value applied to Hoover's NPV evaluation included move-related costs, such that the TIA value was reduced or the separate move-related costs applied to Hoover were removed.

The government, citing *Blue & Gold Fleet v. United States*, argues that, because the RLP expressly sets out that the TIA will be assessed and Hoover failed to challenge the inclusion of the TIA prior to the close of the bidding process, Hoover has waived its ability to challenge the TIA costs. *See* [ECF 25] at 18-19 (citing 492 F.3d 1308, 1313 (Fed. Cir. 2007)). The Court is not persuaded by this argument.

---

[13] As part of its corrective action after the GAO decision, the GSA obtained an independent government estimate for the build-out of a new office space in Frankfurt, Kentucky. AR 1349-53. The GSA utilized the estimate to establish the replication costs applied to Hoover's NPV evaluation. *See* AR 1355. To avoid duplication, the GSA subtracted the disclosed TIA value of $41.13 that was applied to Hoover as a non-incumbent offeror from the total build-out costs and applied the remaining costs to Hoover's NPV evaluation as replication costs. *See id.* While this may have addressed potential duplication between the TIA value and the replication costs, it did not address potential duplication between the move-related costs included in the TIA value and those costs included in the telecommunication and furniture move costs applied to Hoover's NPV evaluation.

In *Blue & Gold*, the Federal Circuit held that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." 492 F.3d at 1313. The Federal Circuit subsequently extended this reasoning to apply to all situations in which the protesting party had the opportunity to challenge a solicitation before the award and failed to do so. *See COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1382 (Fed. Cir. 2012)). A defect in a solicitation is patent if it is an obvious omission, inconsistency, or discrepancy of significance or if it could have been discovered by reasonable and customary care. *See Inserso Corp. v. United States*, 961 F.3d 1343, 1349 (Fed. Cir. 2020).

Here, the GSA's lack of documentation underlying the disclosed TIA values applicable to the incumbent and non-incumbent offerors was not obvious from the terms of the RLP or advertisement. Further, the LCO's Statement of Fact and Position states that TIA cost information is never disclosed to offerors, so this information was not available to Hoover. *See* AR 1090. Hoover was not prompted to inquire about the validity of the disclosed TIA values until after the close of the bidding process. Prior to the close of bidding, Hoover logically believed that the replication and move-related costs were accounted for by the difference between the revised TIA values to be applied to the incumbent and non-incumbent offerors. *See* [ECF 23-1] at 14. It was not until Hoover was notified that its offer had not been selected as the LPTA offer, and it learned that the TIA applied to non-incumbent offerors did not encompass all replication and move-related costs that it began to question the validity of the TIA values disclosed in the advertisement. Thus, the GSA's lack of supporting documentation could not have been discovered by Hoover prior to the close of the bidding process using reasonable and customary care. Accordingly, Hoover has not waived its challenges in this regard.

## B.     The GSA Did Not Utilize Undisclosed Criteria when Calculating Hoover's NPV, Arbitrarily Ignore Hoover's Offer to Pay for Move-Related Costs, or Improperly Assist MSDG in Restoring Its Eligibility.

Hoover further alleges that the GSA employed unstated evaluation criteria when calculating Hoover's NPV, arbitrarily ignored Hoover's offer to pay for move-related costs, and improperly assisted MSDG in restoring its eligibility for award. For the reasons set forth below, the Court finds these arguments unpersuasive.

### i.     The GSA Did Not Use Unstated Evaluation Criteria.

Hoover argues that the GSA utilized undisclosed criteria when calculating Hoover's NPV because, in addition to the flat TIA costs of $41.13 disclosed in the advertisement, it imputed replication costs, physical move costs, and telecom costs that Hoover contends overlap with the TIA costs. [ECF 23-1] at 12-15. The Court is not persuaded by this argument. The RLP clearly stated that replication and move-related costs would be considered in addition to the TIA.

An agency must evaluate proposals and make awards based on the criteria stated in the solicitation. *Poplar Point RBBR, LLC v. United States*, 147 Fed. Cl. 201, 219 (2020). The application of unstated evaluation criteria renders an agency's decision arbitrary and capricious.

*See NVE, Inc. v. United States*, 121 Fed. Cl. 169, 180 (2015) (stating that an offeror can challenge an agency's analysis as "arbitrary, capricious, or an abuse of discretion" when the agency relies on unstated evaluation criteria). To succeed on an unstated evaluation criteria claim, a protester must show that "the procuring agency used a significantly different basis in evaluating the proposals than was disclosed[.]" *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 387 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004).

In calculating Hoover's NPV, the GSA used the following values: $41.13 for tenant improvements of new space; [* * *] for physical move costs; [* * *] for telecom costs; and [* * *] for replication costs, resulting in an NPV of [* * *]. AR 1730-31. The RLP clearly provides that TIA costs, replication costs, and move-related costs are each treated as a distinct pricing term. *See e.g.*, AR 176, 179, 182. It further provides that "the cost of relocation of furniture, telecommunications, replication[] costs, and other move-related costs [will be added to the NPV calculation], if applicable." AR 182. Thus, Hoover has failed to establish that the GSA used a significantly different basis in evaluating Hoover's NPV from that disclosed in the RLP. *See Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) ("Where an evaluation is challenged, we will examine the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter of administrative discretion.") (quoting *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)); *Sophion Bioscience, Inc. v. United States*, 154 Fed. Cl. 414, 422 (2021) (finding that the government did not use unstated evaluation criteria when it evaluated proposals based on the unambiguous text of the RFQ).[14]

### ii. The GSA Acted Reasonably by Not Considering Hoover's Offer to Cover Moving Costs.

Next, Hoover argues that the GSA acted without a rational basis by not considering Hoover's offer to cover all "physical costs associated with relocation . . . including moving all furniture, fixtures, telephones, computers, and electronics."[15] [ECF 23-1] at 16; *see also* AR 832, AR 1090. Specifically, Hoover argues that its offer constituted a "betterment" in its proposal that the GSA did not have the discretion to ignore. [ECF 23-1] at 16. Hoover maintains that the GSA was required to consider this offer because the AAAP system did not provide a mechanism for making such an offer, and the GSA advised Hoover to include this offer as an attachment. *Id.*

The Court finds that the GSA had a rational basis for disregarding Hoover's offer to cover moving costs. Section 3.06(A)(4) of the RLP states that "Riders, Clarifications to Offer, Exceptions to Offer and other additions, deletions, or changes to the terms of the RLP will not be accepted by the Government." AR 176. Hoover's letter clearly falls within the prohibited offeror

---

[14] The Court addresses Hoover's argument that the addition of replication and move-related costs were duplicative with the TIA cost in Section III.A of this opinion, as it is better characterized as a challenge to the adequacy of the GSA's documentation in support of each cost utilized in the NPV evaluation. *See supra* Section III.A.

[15] It is unclear whether this letter was submitted as an attachment within the AAAP system, as a separate communication to the LCO outside of the AAAP system, or both. *See* AR 639, 832, 1090. Nevertheless, the Court does not view this issue as material to its conclusion that the GSA acted reasonably when it decided not to consider the letter as part of its NPV evaluation.

attachments as set forth in the RLP, most logically as a rider or clarification to its offer. The AAAP is designed to streamline the lease procurement process by establishing the financial variables that are considered and automating the NPV calculation to reduce math errors commonly present in a traditional paper process. *See* AR 8. Further, the AAAP and the advertisement do not allow for negotiations. AR 8, 196. In this context, the GSA acted reasonably when it did not consider Hoover's offer to cover moving costs because this offer and its financial components were not captured in the automated lease price evaluation system. Further, the RLP term prohibiting riders and clarifications applies to *all* such attachments, regardless of whether the rider or clarification affects the government favorably or unfavorably. This general prohibition ensures that the government avoids negotiations with offerors and potential errors that may arise from consideration of proposed lease pricing terms offered outside of the AAAP platform.

With respect to Hoover's argument that it was advised by the LCO to include its offer to cover moving costs as an attachment, [ECF 23-1] at 16, these statements are insufficient to override the plain language of the solicitation, which provides that an attachment, like the one offering to cover moving costs that Hoover submitted with its proposal, will not be accepted by the GSA. *Banknote Corp. of Am.*, 365 F.3d at 1350 ("Interpretation of a solicitation begins with an examination of the plain language."); *Hunt Constr. Grp., Inc. v. United States*, 281 F.3d 1369, 1373 (Fed. Cir. 2002) ("If the plain language is unambiguous on its face, that language controls, and the inquiry ends."). As such, the Court finds that the GSA acted reasonably by not considering Hoover's offer to cover moving costs.[16]

### iii.     The GSA Properly Referred the Competency Issue to the SBA.

Finally, Hoover argues that the GSA acted in violation of the terms of the RLP and applicable regulations, *see* [ECF 29] at 13-14, when it "permitted—and went so far as to proactively assist—MSDG in rehabilitating its ineligibility status." [ECF 23-1] at 21-22. Hoover contends that when the GSA determined that MSDG was no longer eligible for the award, it should have immediately made the award to Hoover. [ECF 23-1] at 22. By not doing so, Hoover claims that the "GSA allowed MSDG to waive a material solicitation requirement to the detriment of Hoover." *Id.* In support of this assertion, Hoover relies on Section 1.02(G)(5) of the RLP, which states:

> Offers will also be subject to further due diligence review and screening to confirm whether they meet the requirements of the RLP (e.g., Fire Protection and Life Safety, Financial Capability, etc.) in

---

[16] Hoover relies on *Linc Gov't Servs., LLC v. United States* to argue that its offer to cover moving costs constituted a betterment that the GSA acted arbitrarily and capriciously in failing to consider. [ECF 23-1] at 16 (citing 108 Fed. Cl. 473 (2012)). Hoover's reliance is misplaced and unpersuasive. In *Linc Gov't Servs., LLC*, the court determined that the agency's evaluation was arbitrary when it failed to consider certain aspects of the protestor's proposal as "betterments" because the solicitation contained "betterment" as a defined term. *See* 108 Fed. Cl. at 494. In that case, the solicitation defined a "betterment" as "portions of the accepted proposal which both conform to and exceed the provisions of the [S]olicitation." *Id.* (alteration in the original). The solicitation further required the agency to "recognize as a 'betterment' an 'offer [that provides] additional value to the [Army].'" *Id.* (alteration in the original). In this case, the RLP does not contain an evaluation criterion for proposed "betterments."

> addition to unique agency requirements stated in the project advertisement. An award is contingent upon meeting all of these requirements; offers that do not meet all of these requirements shall be deemed ineligible for award.

AR 163.

Despite its arguments to the contrary, Hoover has not demonstrated that the GSA violated the RLP terms or applicable regulations. After selecting MSDG's offer as the LPTA offer, the GSA subjected MSDG to due diligence as required by the RLP. AR 163. As part of that due diligence, the GSA discovered a responsibility issue that rendered MSDG ineligible, and the GSA referred the matter to the SBA to obtain a COC. *See* AR 1442-46, 1628. Once the GSA received a COC, it awarded the lease to MSDG. *See* AR 1720, 1730. Nothing in the RLP supports Hoover's contention that the GSA's actions were impermissible. Rather, the record supports the conclusion that the GSA took appropriate action by referring the matter to the SBA in accordance with FAR 19.602-1(a). This provision provides:

> (a)     Upon determining and documenting that an apparent successful small business offeror lacks certain elements of responsibility (including, but not limited to, capability, competency, capacity, credit, integrity, perseverance, tenacity, and limitations on subcontracting, but for sureties see 28.101-3(f) and 28.203-1(e)), the contracting officer shall-
>
> (1)     Withhold contract award (see 19.602-3); and
>
> (2)     Refer the matter to the cognizant SBA Government Contracting Area Office (Area Office) serving the area in which the headquarters of the offeror is located, in accordance with agency procedures, except that referral is not necessary if the small business concern-
>
> (i)     Is determined to be unqualified and ineligible because it does not meet the standard in 9.104-1(g), provided, that the determination is approved by the chief of the contracting office; or
>
> (ii)    Is suspended or debarred under Executive Order 11246 or subpart 9.4.

Hoover contends that the GSA was not required by FAR 19.602-1(a)(2) to refer the competency matter to the SBA because it falls under the exception outlined in FAR 19.602-

1(a)(2)(i).[17] [ECF 29] at 13. However, the record does not clearly indicate whether the ineligibility determination was approved by the chief of the contracting office,[18] and, even if it did, the provision provides a circumstance in which referral "*is not necessary.*" FAR 19.602-1(a)(2) (emphasis added). It does not prohibit the contracting officer from seeking a COC notwithstanding the provision. Thus, the Court finds that the GSA acted properly by referring the matter to the SBA after it determined that MSDG lacked an element of responsibility.

Hoover also contends that it should have been awarded the lease because the SBA competency determination took too long. [ECF 39] at 11. FAR 19.602-4(c) states that "[t]he contracting officer shall proceed with the acquisition and award the contract to another appropriately selected and responsible offeror if the SBA has not issued a COC within 15 business days (or a longer period of time agreed to with the SBA) after receiving the referral." The GSA referred MSDG's responsibility determination to the SBA on November 16, 2021. AR 1628. The SBA did not return a COC for MSDG until January 12, 2022. AR 1720. Hoover contends that the GSA violated FAR 19.602-4(c) "[b]ecause [the] GSA first made an SBA referral on November 16, 2021[,] and nothing in the record demonstrates that there was an agreement between [the] GSA and [the] SBA to extend this deadline, [the] GSA should have made an award to Hoover on or about December 8, 2021." [ECF 39] at 11.

However, Hoover waived this argument because Hoover did not raise it until oral argument. This argument is not simply an extension of the arguments in its briefing, as Hoover contends. *See* [ECF 39]. Rather, it is a completely new argument. Prior to oral argument, Hoover had not alleged any violations of the FAR by the GSA, nor had Hoover mentioned the specific subsection that it now contends the GSA violated. As such, this argument is waived. *Insight Pub. Sector, Inc. v. United States,* 157 Fed. Cl. 416, 428 n. 10 (2021) ("[A] party waives arguments that are omitted from its briefing and are raised for the first time at oral argument.").

Further, even if it had not been waived, this argument would fail because the SBA COC was timely. Hoover's position ignores the context provided by the other provisions in FAR 19.602, such as FAR 19.602-4(e), which states:

> Contract award shall be withheld by the contracting officer for a period of 15 business days (or longer if agreed to by the SBA and the contracting officer) following receipt by the appropriate SBA Area Office of a referral that includes all required documentation.

---

[17] FAR 9.104-1(g) provides that a prospective contractor must be "qualified and eligible to receive an award under applicable laws and regulations."

[18] The parties disagree as to who the chief of the contracting office is and whether the appropriate individual approved the determination that MSDG was a disqualified and ineligible offeror. However, this determination is irrelevant because, even had the chief of the contracting officer approved the determination that MSDG was ineligible, the regulation still provides the contracting officer with discretion to refer the matter to the SBA. *See John C. Grimberg Co.,* 185 F.3d. at 1303 (noting that "contracting officers are given wide discretion" concerning responsibility determinations.).

FAR 19.602-4(e). Accordingly, the fifteen-day period began "following receipt by the *appropriate* SBA Area Office . . . " *Id.* (emphasis added). The GSA initially sent its referral to the incorrect SBA Area Office. AR 1653-54. The appropriate SBA Area Office received the required documentation on December 15, 2021. AR 1660-61. MSDG requested an extension of time on December 21, 2021, and the SBA and the GSA explicitly agreed to a four-business day extension on December 22, 2021. AR 1709-10. The COC was issued on January 12, 2022, eighteen business days after the appropriate SBA Area Office received the required documentation, and one business day before the expiration of the agreed-upon four-day business extension. *See* AR 1720. As such, the GSA did not violate FAR 19.602-4(c).

### C.    Hoover is Entitled to Injunctive Relief.

Hoover requests that the Court enter a permanent injunction enjoining performance of the contract award to MSDG and declaring Hoover the awardee under the RLP. [ECF 23-1] at 28. When deciding if a permanent injunction is warranted, the Court considers whether: "(1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Centech Grp. Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004)). Achieving success on the merits "is a necessary element for a permanent injunction." *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 998 (Fed. Cir. 2018).

While the Court does not declare Hoover the awardee under the RLP as requested by Hoover, the Court finds that Hoover is entitled to injunctive relief because it has succeeded on the merits of its claim and the remaining injunctive relief factors weigh in favor of granting such relief. *See Cont., Consulting, Eng'g LLC v. United States*, 104 Fed. Cl. 334, 353 (2012) ("Although plaintiff's entitlement to injunctive relief depends on its succeeding on the merits, it is not determinative because the three equitable factors must be considered, as well.") (citing *PGBA*, 389 F.3d at 1228-29). First, Hoover will suffer irreparable harm without injunctive relief because there is no adequate alternative remedy for its lost opportunity to fairly compete for the award of the lease. *See Insight Sys. Corp. v. United States*, 110 Fed. Cl. 564, 582 (2013) (highlighting "[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction") (alteration in original); *Sys. Studies & Simulation, Inc. v. United States*, 146 Fed. Cl. 186, 203 (2019) ("The United States Court of Federal Claims has repeatedly held that a protester suffers irreparable harm if it is deprived of the opportunity to compete fairly for a contract.") (citing cases). Second, the balance of hardships weighs in Hoover's favor. In the absence of injunctive relief, Hoover will be deprived of an opportunity to compete for a ten-year lease of its vacant property. [ECF 23-1] at 29. The hardship to the government and MSDG arising from the delay in finalizing a lease is less significant because the SSA currently resides in MSDG's space. *See Sys. Studies*, 146 Fed. Cl. at 203 (stating "only in an exceptional case would [delay] alone warrant a denial of injunctive relief, or the courts would never grant injunctive relief in bid protests") (alterations in original). Because MSDG will continue to provide the SSA with the existing leased space in the interim, injunctive relief will not result in hardship to the government by depriving the SSA of its leased space or to MSDG by depriving it of its tenant. Finally, the public interest weighs in Hoover's favor because "the

17

public interest in preserving the integrity and fairness of the procurement process is served by enjoining arbitrary or capricious agency action." *Bilfinger Berger AG Sede Secondaria Italiana v. United States*, 94 Fed. Cl. 389, 393 (2010); *see also PGBA, LLC v. United States*, 57 Fed. Cl. 655, 663 (2003); *Ernst & Young, LLP v. United States*, 136 Fed. Cl. 475, 519 (2018). Since all four factors weigh in Hoover's favor, Hoover is entitled to injunctive relief.

## IV.   CONCLUSION

For the reasons stated above, Hoover's motion for judgment on the administrative record is **GRANTED**, and the government's and MSDG's motions for judgment on the administrative record are **DENIED**. Hoover is entitled to permanent injunctive relief. Specifically, the Court **ENJOINS** the GSA from proceeding with the lease awarded to MSDG based on its prior NPV evaluation and source selection decision. The Court **ORDERS** the GSA to reevaluate the lease offers in a manner that redresses the errors identified in this Opinion. The Clerk is **DIRECTED** to enter judgment accordingly.

Some information contained in this Opinion and Order may be considered protected information subject to the Protective Order entered on March 25, 2022. [ECF 13]. Accordingly, the Opinion and Order is filed **UNDER SEAL**. The parties **SHALL CONFER AND FILE on or before March 28, 2023**, a joint status report that: identifies the information, if any, that the parties contend should be redacted; explains the basis for each proposed redaction; and includes an attachment of the proposed redactions for this Opinion.

**IT IS SO ORDERED.**

s/ Thompson M. Dietz
THOMPSON M. DIETZ, Judge